[No. D018802. Fourth Dist., Div. One. May 16, 1994.]

In re AONTAE D., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
AONTAE D., Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.

## COUNSEL

Carl M. Lewis, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle B. Davis and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FROEHLICH, J.**—A petition was filed alleging that Aontae D. (appellant) came within the provisions of Welfare and Institutions Code[2] section 602 by having committed a robbery and having personally used a firearm in committing that crime. The matter was tried before referee Dumanis, sitting as a temporary judge pursuant to stipulation. She found the robbery charge and firearm use to be true and sustained the petition. Appellant's motion for a new trial was denied, and appellant was placed on probation.

Appellant raises three challenges to the adjudication. First, he claims the referee was without jurisdiction to act because there was no written stipulation that she serve as a judge. Second, he claims the evidence was insufficient to support the true finding. Finally, he claims the court erred in refusing to admit the favorable results of his polygraph test to support his new trial motion.

### I.  *Facts*

Around midnight on December 6, 1992, having finished work at Pizza Hut, Derrick Garrett (hereafter the victim) was walking home, wearing his hat and carrying pizzas. While enroute home, he saw two males riding bicycles. As the bicyclists passed him, one of them, appellant, said: "Oh, you are the pizza man."

Appellant and his companion turned around and pulled up next to the victim, who had crossed the street and was standing next to a closed but well-lighted business, and appellant asked the victim if he had any money. When the victim said no, appellant pulled out a gun, held it in his left hand, and rested it on the handlebar of the bicycle. Appellant again asked if the victim had any money, and the victim then pulled out $100, threw it on the ground, and began walking away. Appellant next asked about the pizzas, which the victim then set on the ground. The victim then ran from the scene.

The victim next saw appellant about a week later at a local laundromat. The victim was sitting in his car waiting for his laundry to dry when

---

[2]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

appellant pulled up and parked next to him. The two made eye contact, and the victim testified they recognized each other.

The next evening the victim was at home when he saw a car pull into the apartment parking lot. The victim recognized it as the same car appellant had occupied the previous night at the laundromat. The victim saw appellant and other individuals exit the car. The victim called the apartment manager, who then called the police.

The police came that night. They went to appellant's apartment, explained to appellant he was a suspect in a crime, and ordered him to step outside to allow the victim to determine if appellant was or was not the perpetrator. Appellant was at first cooperative, but when he and the officers reached his front door he backed away from it, reluctant to go outside. When they did get outside, the victim identified appellant from a vantage point approximately 10 to 15 feet from appellant.

There were two forms of defense. First, a psychologist testified about various factors which can reduce the accuracy of an eyewitness identification. Second, appellant's father provided an alibi, testifying that appellant had come home about 7 p.m. on the day of the robbery, and had gone to his room around 9 or 10 p.m. The father did not see or hear appellant leave the apartment that evening. Appellant testified to a similar set of facts, and claimed he remained in his room all night after retiring.

## II. *The Oral Stipulation Was Sufficient*

■ Appellant first claims that although he orally stipulated to having Referee Dumanis sit as a temporary judge, only a written stipulation confers jurisdiction, rendering the order void.

Section 248 provides that a referee shall not hear matters such as this one "unless all of the parties thereto stipulate in writing that the referee may act in the capacity of a temporary judge." Although this precise statute has not yet been interpreted, numerous courts have examined the substantively indistinguishable language of California Rules of Court,[3] rule 244, and have concluded the requirement of a written stipulation is directory rather than jurisdictional. (See, e.g., *In re Julio N.* (1992) 3 Cal.App.4th 1120, 1123 [5 Cal.Rptr.2d 86] [parties to juvenile proceeding who tried case without objection sufficiently stipulated under rule 244].) The court in the case of *In re Richard S.* (1991) 54 Cal.3d 857 [2 Cal.Rptr.2d 2, 819 P.2d 843], interpreting the language of rule 244, concluded the clause requiring a

---

[3]All rule references are to the California Rules of Court.

written stipulation was directory only, and hence failure to execute a written stipulation did not deprive the court of jurisdiction. (54 Cal.3d at pp. 865-866.)

Appellant insists the cases construing rule 244 do not control the construction of whether the requirement of section 248 is mandatory or directory. However, appellant fails to explain why or how these sections are distinct, or what different considerations applicable to section 248 might justify a disparate construction. Because both the statute and the rule deal with similar subjects and contain similar language, we adopt the same construction: The requirement of a written stipulation is directory, and the absence of a writing does not deprive the court of jurisdiction.

### III.  *There Is Substantial Evidence to Support the True Finding**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV.  *The Court Correctly Excluded Appellant's Posttrial Effort to Admit Evidence of a Favorable Polygraph in Support of a New Trial Motion*

Appellant's final two contentions relate to the court's refusal to consider the results of a posttrial polygraph examination which purported to support the veracity of his claim of innocence. The first claim is one of statutory interpretation, asserting that Evidence Code section 351.1 does not apply to this juvenile court proceeding. The second is one of due process, asserting that the statutory ban on polygraph evidence is unconstitutional.

### A.  *Background*

After trial, appellant moved for a new trial, asserting that new evidence, to wit, the favorable polygraph results, pointed to his innocence. Appellant's motion included an offer of proof directed toward establishing that polygraph tests now meet the "*Kelly/Frye*" test of reliability.[4] The trial court declined to admit the polygraph evidence and denied the new trial motion.

*See footnote 1, *ante*, page 167.

[4] After *Daubert* v. *Merrell Dow Pharmaceutical, Inc.* (1993) 509 U.S. __ [125 L.Ed.2d 469, 113 S.Ct. 2786] the "*Kelly/Frye*" test (so named after *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] and *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46, 34 A.L.R. 145]) *is* at least a linguistic misnomer. *Daubert* concluded that *Frye* was overruled by the adoption of the Federal Rules of Evidence and replaced *Frye* with a lower standard for scientific testimony. (*Daubert, supra,* 509 U.S. at p. __ [125 L.Ed.2d at pp. 479-480].) This federal decision, of course, does not directly displace *Kelly* because *Kelly* construed the California Evidence Code in adopting its standard, albeit in heavy reliance on the rationale of *Frye*. (17 Cal.3d at pp. 30-32.) While *Daubert* may make *Kelly* ripe for reexamination, until our Supreme Court takes such a step, which it has declined to do

## B. *Evidence Code Section 351.1 Applies to Proceedings Under Section 602*

■ Appellant first contends Evidence Code section 351.1 does not apply to proceedings under section 602. Evidence Code section 351.1 provides, in part, that ". . . the results of a polygraph examination . . . shall not be admitted into evidence in any criminal proceeding, . . . or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results." Appellant argues a juvenile proceeding is not a criminal proceeding within the meaning of Evidence Code section 351.1, and hence the ban on polygraphs does not apply.

It is true that a proceeding in juvenile court is not deemed a "criminal proceeding." (§ 203.) However, Evidence Code section 351.1 uses disjunctive language: It is applicable *either* to a "criminal proceeding" *or* to "any trial or hearing of a juvenile for a criminal offense." A petition for wardship under section 602 is heard in juvenile court. In such hearing the state must prove, beyond a reasonable doubt, that the minor committed a criminal offense. (*Richard M.* v. *Superior Court* (1971) 4 Cal.3d 370, 378 [93 Cal.Rptr. 752, 482 P.2d 664].) Evidence Code section 351.1 applies here, because this case involved a "hearing of a juvenile for a criminal offense, . . . in juvenile . . . court."[5]

## C. *Evidence Code Section 351.1 Is Constitutional*

■ Appellant's remaining contention is that excluding a polygraph test violates due process and denies him the benefit of compulsory process. He claims the language of *People* v. *Morris* (1991) 53 Cal.3d 152 [279 Cal.Rptr. 720, 807 P.2d 949] and *People* v. *Harris* (1989) 47 Cal.3d 1047 [255 Cal.Rptr. 352, 767 P.2d 619] inferentially supports his position that a trial court should hold a hearing on *Kelly/Frye* questions and, if satisfied on the

(see *People* v. *Wash* (1993) 6 Cal.4th 215, 243, fn. 9 [24 Cal.Rptr.2d 421, 861 P.2d 1107] [unnecessary to decide if *Daubert* had any effect on *Kelly*]), we must continue to adhere to the binding precedent of *Kelly*. Although the "Frye" half of the *Kelly/Frye* rule may from a legalistic point of view no longer exist, we will continue to refer to the evidentiary concept as that of "*Kelly/Frye*," recognizing that it is so denominated in numerous California cases and treatises.

[5]For this reason appellant's reliance on *In re Kathleen W.* (1987) 190 Cal.App.3d 68 [235 Cal.Rptr. 205] is misplaced. That case, which held that an evidentiary hearing on the *Kelly/Frye* issues was required, was a dependency hearing under section 300, which does *not* depend on a showing of criminal conduct by the juvenile. The court specifically stated it would consider polygraph evidence because Evidence Code section 351.1 left open the admissibility of polygraphs "in civil and *noncriminal* juvenile matters." (190 Cal.App.3d at p. 72, italics added.) Our case, however, is not a "noncriminal juvenile matter."

scientific acceptance of the polygraph, may admit the evidence notwithstanding Evidence Code section 351.1. We disagree.

We initially note that neither *Morris* nor *Harris* suggested a trial court may ignore Evidence Code section 351.1 if it is satisfied the polygraph has become scientifically accepted. Instead, *Harris* and *Morris* (along with *People* v. *Price* (1991) 1 Cal.4th 324, 419 [3 Cal.Rptr.2d 106, 821 P.2d 610]) merely held it was unnecessary to decide if Evidence Code section 351.1 barred such evidence, because even under the old rules the defendants had failed to establish a foundation for admission of the polygraph.[6] (*People* v. *Harris*, *supra*, 47 Cal.3d at p. 1094; *People* v. *Morris*, *supra*, 53 Cal.3d at p. 193.) Thus, nothing in those cases suggested a court may disregard Evidence Code section 351.1; instead, the cases merely held the exclusion was proper for independent reasons.

Appellant's central contention is that Evidence Code section 351.1 abridges his due process right to produce crucial exculpatory evidence. However, due process does not require the admissibility of *all* evidence which may tend to exonerate the defendant. (*People* v. *Blackburn* (1976) 56 Cal.App.3d 685, 691 [128 Cal.Rptr. 864].) Although due process places some limits on a state's right to restrict evidence, states are generally free to decide what evidence will be admitted in their courts, and the federal Constitution provides only a " 'limited restraint upon state evidentiary rules where exculpatory evidence is excluded by arbitrary state rules.' [Citation.]" (*People* v. *Kegler* (1987) 197 Cal.App.3d 72, 85 [242 Cal.Rptr. 897].)

Appellant's constitutional challenge to Evidence Code section 351.1 requires a showing that the ban on polygraphs is an arbitrary exercise of the Legislature's control over evidence. We must examine the exculpatory value of the evidence, and then determine whether the state's countervailing interests are sufficient to support this evidentiary restriction.

### (1) *Nature of the Evidence*

We begin by noting that polygraph evidence is not analogous to the types of crucial exculpatory evidence the exclusion of which was deemed improper by other courts. In *Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], for example, state rules were found to violate due process because the rules (1) limited cross-examination of hostile witnesses and (2) precluded a defendant from introducing hearsay statements by

---

[6]Even prior to the enactment of Evidence Code section 351.1, admissibility of polygraphs required a showing that *Kelly/Frye* was satisfied. Since the defendants in *Morris* and *Harris* made no such showing, "the ruling [excluding the polygraph results] is sustainable regardless of the effect of Evidence Code section 351.1." (*People* v. *Morris*, *supra*, 53 Cal.3d at p. 193.)

a third party confessing to the crime. (*Id.* at pp. 296-300 [35 L.Ed.2d at pp. 309-312].) In *Washington* v. *Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920] the state rule prevented defendants from eliciting favorable testimony from a percipient witness merely because the witness was an alleged accomplice of the defendant. (*Id.* at pp. 20-22 [18 L.Ed.2d at pp. 1023-1025].) In those and similar cases, evidence traditionally accepted as competent and central to the truthfinding process (i.e., percipient witnesses' statements; cross-examination of hostile witnesses) was barred by arbitrary rules, severely damaging the defendant's ability to challenge the prosecution's case. Here, however, the evidence is not generally viewed as competent.[7]

A polygraph is not so crucial that its absence precludes a defendant from mounting a defense. A defendant can still testify; he can still present corroborating witnesses; he can still cross-examine hostile witnesses. In an analogous situation our Supreme Court declared polygraph evidence was not of such "crucial" importance that its exclusion denied the defendant a fair trial. In *People* v. *Espinoza* (1992) 3 Cal.4th 806 [12 Cal.Rptr.2d 682, 838 P.2d 204] a defendant offered to take a polygraph test just prior to making a statement to police, which statement was partly exculpatory. At trial, in order to bolster the credibility of this partly exculpatory statement, the defendant wanted to show his offer to take the polygraph test. The trial court excluded the "offer to take" under Evidence Code section 351.1, and the Supreme Court rejected defendant's claim of a due process violation. The *Espinoza* court, noting cases such as *Chambers* v. *Mississippi* and *Washington* v. *Texas* which involved crucial exculpatory evidence, stated: "These cases are distinguishable from the situation here. Exclusion under Evidence Code section 351.1 of defendant's 'offer to take' a polygraph test at most prevented presentation of evidence that might have bolstered defendant's credibility. Defendant was, however, not foreclosed from effectively challenging the prosecution's case or from presenting crucial exculpatory evidence. There was no due process violation." (*People* v. *Espinoza, supra*, 3 Cal.4th at p. 818.)

The same rationale applies here. Even assuming the validity of the polygraph results, an assumption of questionable strength, we note the results were offered merely to bolster appellant's credibility. As in *Espinoza*, we cannot view polygraph evidence here as being similar to the type of "crucial evidence" considered by the federal cases.

---

[7]Instead, it appears to be the majority view that either polygraphs are inherently unreliable or the little probative value garnered from the tests is outweighed by the prejudice and confusion entailed in their introduction. (See *State* v. *Dean* (1981) 103 Wis.2d 228 [307 N.W.2d 628, 646].)

Appellant cites *McMorris* v. *Israel* (7th Cir. 1981) 643 F.2d 458, 462 to argue that a polygraph supporting a defendant's credibility *is* crucial exculpatory evidence. Reliance on *McMorris* is misplaced. First, of course, to the extent *McMorris* simply reaches a different conclusion from that reached in *Espinoza* we are bound by the latter. Second, *McMorris* was decided under Wisconsin law and involved a markedly different issue. There, polygraph results were deemed admissible if certain procedural protections designed to enhance reliability were met, because the Wisconsin courts had concluded these protections would produce a reliable form of evidence. The *McMorris* court evaluated only whether the state, having decided the evidence *was* competent and reliable, could permit a prosecutor to veto its admission for tactical reasons. (*Id.* at pp. 463-466.) In California, however, both the judiciary (see, e.g., *People* v. *Espinoza, supra,* 3 Cal.4th at p. 817) and the Legislature (see *People* v. *Kegler, supra,* 197 Cal.App.3d at pp. 86-89 [reviewing policy considerations evaluated by the Legislature in enacting Evid. Code, § 351.1]) have concluded the evidence is *not* sufficiently probative to overcome the flaws and burdens attendant to use of polygraph materials.[8]

Thus, the first aspect of the due process claim—that polygraph evidence is competent and crucial enough that its absence would significantly impair the defendant's ability to mount a defense—is without support.

### (2) *State's Countervailing Interest*

The second aspect of the due process inquiry is whether the state rule is arbitrary, or whether it is supported by significant countervailing interests. We view Evidence Code section 351.1 as a rational exercise of the state's power to decide that a certain category of evidence is as yet not sufficiently probative to overcome competing policy considerations weighing against admissibility.[9] The court in *People* v. *Kegler, supra,* 197 Cal.App.3d 72 extensively cataloged the numerous state interests in excluding polygraphs:

---

[8]We further note *McMorris* no longer appears to be good law. The *McMorris* analysis was predicated on polygraph results being admissible under a judicially created scheme first announced by the Wisconsin Supreme Court in *State* v. *Stanislawski* (1974) 62 Wis.2d 730 [216 N.W.2d 8]. However, the Wisconsin Supreme Court in *State* v. *Dean, supra,* 103 Wis.2d 228 [307 N.W.2d 628] later abandoned *State* v. *Stanislawski.* The *Dean* court extensively examined the results of its seven-year experiment with polygraphs, and concluded that because polygraphs lacked sufficient reliability and placed too heavy a burden on the trial court in having to examine myriad factors affecting test results, polygraphs would be inadmissible. Thus, *McMorris* relied on a case which is no longer good law in Wisconsin.

[9]This provides a second basis for distinguishing cases, such as *Chambers* v. *Mississippi, supra,* 410 U.S. 284 and *Washington* v. *Texas, supra,* 388 U.S. 14, in which evidentiary restrictions were found to offend due process. The rules in *Chambers* simply lacked any rational basis. The defendant's cross-examination was barred by an arcane rule of the

avoiding imposition of the tremendous burden on the court of assessing foundational factors for admission (i.e., the examinee's biological and psychological makeup; the examiner's skill, integrity, training and conduct during the test; the interpretive overlay the examiner places on both physiological responses and the examinee's physical cues; etc.); the jury's reassessment of these same factors in deciding whether ultimately to credit the results; the lack of general acceptance in the scientific community of the validity of the tests; the potential for confusion and prejudice if trial were diverted from determining guilt or innocence and allowed to degenerate into a battle over the results of machines; etc. *Kegler* noted the Legislature had such concerns in mind when enacting Evidence Code section 351.1. (*People v. Kegler, supra,* 197 Cal.App.3d at pp. 86-89.) *Kegler* concluded, and we agree, that these factors provide legitimate and compelling reasons to support the legislative decision to exclude polygraph evidence. (*Id.* at p. 89.)

Appellant's argument rests on the premise that polygraphs can be proved reliable. Our Legislature has decided differently, concluding the probative value of polygraphs is insufficient to outweigh the collateral problems of such tests. Whatever latitude a court might have absent legislative action, we are not free to reject the legislative judgment unless the rule is arbitrary. Evidence Code section 351.1 is founded on a sound, rather than an arbitrary, judgment of the value and costs of polygraphs, which judgment we cannot ignore.

## V. *Disposition*

The judgment is affirmed.

Huffman, Acting P. J., and Nares, J., concurred.

---

common law precluding a party from impeaching his own witnesses; and the defendant could not use a hearsay confession because Mississippi, despite recognizing a hearsay exception for a "declaration against pecuniary interest," refused (for apparently irrational reasons) to recognize a similar exception for a "declaration against penal interest." In *Washington,* the state rule prevented a defendant from using testimony of an alleged coparticipant to exculpate, *even though the rule concomitantly allowed the prosecution to use the testimony of the same person if it would inculpate,* without any rational basis for the distinction.